UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:  COLUMBIA COLLEGE RANKINGS ACTION | **MEMORANDUM OPINION & ORDER**<br><br>22 Civ. 5945 (PGG)<br><br>(Consolidated with 22 Civ. 6567 (PGG)) |

PAUL G. GARDEPHE, U.S.D.J.:

In this putative class action brought under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), Plaintiffs Ravi Campbell and Students A-D allege that Columbia University – sued herein as The Board of Trustees of Columbia University in the City of New York ("Columbia" or the "University") – provided inaccurate data to U.S. News & World Report ("U.S. News") in order to improve the University's position on the publication's "Best National Universities" list.  Plaintiffs allege violations of New York General Business Law ("GBL") §§ 349 and 350, breach of contract, and unjust enrichment.  (Am. Cmplt. (Dkt. No. 32))[1]

Columbia has moved to dismiss the Amended Complaint pursuant to Fed. R. Civ P. 12(b)(1) and (b)(6) arguing that (1) Plaintiffs lack standing to bring their claims; (2) Plaintiffs' GBL claims fail under New York law; (3) Plaintiffs' contract claims are barred by New York law and impermissibly speculative; and (4) Plaintiffs' unjust enrichment claim is duplicative of their breach of contract claim and not adequately pled.  (See Def. Br. (Dkt. No. 44))

For the reasons stated below, Defendant's motion to dismiss will be granted in part and denied in part.

---

[1]  Unless otherwise indicated, all citations are to the docket in 22 Civ. 5945 (PGG).

## BACKGROUND

I.    FACTS[2]

The Board of Trustees of Columbia University "is the governing body vested with the management and control of Columbia," "a private research university located in New York." (Id. ¶ 18)  Plaintiff Ravi Campbell was enrolled as a student at Columbia from 2014 through 2018.  (Id. ¶ 12)  Plaintiff Student A was enrolled as a graduate student at Columbia from 2019 through 2021.  (Id. ¶ 13)  Plaintiff Student B was enrolled as a student at Columbia from 2014 through 2020.  (Id. ¶ 14)  Plaintiff Student C was enrolled as a graduate student at Columbia from 2016 through 2020.  (Id. ¶ 15)  Plaintiff Student D was enrolled as a graduate student from 2011 through 2015.  (Id. ¶ 16)

U.S. News "is an American media company that publishes news, consumer advice, analysis, and university rankings."  (Id. ¶ 26)  The company's "Best National Universities" list ranks universities based on seventeen "measures of quality," including class size, student-faculty ratio, and percent of faculty with a "terminal degree" in their field.  (Id. ¶¶ 27-29)  "Normalized scores for each measure are weighted and added together, according to a formula, to arrive at a final overall score."  (Id. ¶ 29)  The Amended Complaint alleges that prospective college and graduate students "rely on [U.S. News'] rankings . . . when deciding whether to apply to and/or attend a university," and universities use the rankings in their marketing materials.  (Id. ¶¶ 39, 40)

For purposes of the 2021-22 U.S. News rankings, "Columbia represented to [U.S. News] that . . . 83% of its [undergraduate] classes had fewer than twenty (20) students," "that

---

[2]  The Court's factual statement is drawn from the Amended Complaint.  The well-pleaded facts are presumed true for purposes of resolving Defendant's motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

8.9% of undergraduate classes enroll fifty (50) students or more," that "100% of its full-time faculty h[e]ld a terminal degree (i.e., PhD, MBA, MFA, etc.)," and "that 96.5% of its non-medical faculty are full-time." (Id. ¶¶ 30, 45)

In 2002, U.S. News created the Common Data Set Initiative as part of an effort to standardize and improve college data transparency. (Id. ¶ 24) Columbia elected not to participate in the Common Data Set Initiative and instead "submitted annual data sets of its university characteristics that it alone prepared." (Id. ¶ 31) Indeed, during the entire period between 1988 and 2022, Columbia submitted its own data sets to U.S. News. (Id. ¶ 41) U.S. News "in turn ranked [Columbia] as to its quality as a university . . . from 1988 to 2022" based on the University's self-reported data. (Id. ¶ 42) During the period between 1988 and 2022, Columbia's U.S. News ranking rose from 18th place in 1988 to as high as 2nd place in 2022. (Id. ¶ 43)

In February 2022, Michael Thaddeus, a Columbia professor of mathematics, "published an expose demonstrating that Columbia misreported data to [U.S. News] that was used to calculate Columbia's [U.S. News'] rankings." (Id. ¶ 44) Professor Thaddeus stated that for the U.S. News 2021-2022 rankings, Columbia had misreported the number of undergraduate classes that enrolled fewer than twenty students, the number of undergraduate classes that enrolled more than fifty students, the percentage of full-time faculty that held a terminal degree, the percentage of non-medical faculty that are full-time, and the amount of money Columbia spends on education. (Id. ¶ 45)

On June 30, 2022, after the publication of Professor Thaddeus' article, Columbia announced that it would "refrain from submitting data to U.S. News and World Report for [the 2022-23] undergraduate college rankings" and "plan[ned] to publish a Common Data Set" in the

fall. (<u>Id.</u> ¶ 47)  On July 7, 2022, U.S. News announced that it had unranked Columbia because it was unable to verify the data that Columbia had previously provided.  (<u>Id.</u> ¶ 48)

On September 9, 2022, Columbia issued a statement announcing the release of two Common Data Sets, as promised in June 2022, and explained that the "data in our newly posted Common Data Sets strictly adheres to Common Data Set instructions as we understand them."  (<u>Id.</u> ¶ 49)  In the statement, Columbia' Provost acknowledged that "[o]n two of the metrics questioned by [Professor Thaddeus], class size and faculty with terminal degrees, we determined we had previously relied on outdated and/or incorrect methodologies."  (<u>Id.</u>)

The Provost explained that "the prior methodologies used" resulted in (1) "overreporting the number of classes with under 20 students," "underreporting of classes with between 20 and 29 students," and (3) overreporting the number of full-time faculty that have terminal degrees.  (<u>Id.</u>)  According to the Provost, rather than the previously reported 82.5% of undergraduate classes enrolling fewer than twenty students, the correct figure was 57%, and instead of 100% of full-time faculty holding a terminal degree, the correct figure was 95.4%. (<u>Id.</u> ¶ 49)

According to the Amended Complaint, given the discrepancies in the self-reported data as compared to the new Common Data Set, "Columbia's 2022 Common Data Set submission plausibly suggests that Columbia's representations to [U.S. News] from 2011-2012 through 2021-2022 were false" as to "the percentage of Columbia's classes with fewer than twenty (20) students in those years."  (<u>Id.</u> ¶ 71)

## II.  <u>**PROCEDURAL HISTORY**</u>

Plaintiff Ravi Campbell filed the Complaint in 22 Civ. 5945 on July 12, 2022 (Cmplt. (Dkt. No. 1)), and Plaintiff Student A filed the Complaint in 22 Civ. 6567 on August 2,

2022.  (Student A v. The Board of Trustees of Columbia University in the City of New York, No. 22 Civ. 6567 (S.D.N.Y.) (Dkt. No. 1))  In a September 8, 2022 order, this Court consolidated the two cases.  (Sept. 8, 2022 Order (Dkt. No. 13))

On December 16, 2022, Plaintiffs filed an Amended Complaint that reflects the consolidated claims and adds Students B-D as plaintiffs.  (Am. Cmplt. (Dkt. No. 32))

On March 13, 2023, Defendant moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6).  (Def. Mot. (Dkt. No. 43))

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)."  Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Where subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.'"  APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)); see also Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) (citing Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002)) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.").  "Under Rule 12(b)(1)[,] even 'a facially sufficient complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient.'"  Castillo v. Rice, 581 F. Supp.

2d 468, 471 (S.D.N.Y. 2008) (quoting <u>Frisone v. Pepsico Inc.</u>, 369 F. Supp. 2d 464, 469

(S.D.N.Y. 2005)).

      "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must

take all facts alleged in the complaint as true and draw all reasonable inferences in favor of

plaintiff." <u>Sweet v. Sheahan</u>, 235 F.3d 80, 83 (2d Cir. 2000); <u>Warth v. Seldin</u>, 422 U.S. 490, 501

(1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and

reviewing courts must accept as true all material allegations of the complaint, and must construe

the complaint in favor of the complaining party."). The court "may consider affidavits and other

materials beyond the pleadings to resolve the jurisdictional issue, but . . . may not rely on

conclusory or hearsay statements contained in the affidavits." <u>Id.</u>; <u>see also</u> <u>Morrison v. Nat'l</u>

<u>Austl. Bank Ltd.</u>, 547 F.3d 167, 170 (2d Cir. 2008), <u>aff'd</u>, 561 U.S. 247 (2010) ("In resolving a

motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may

consider evidence outside the pleadings." (citing <u>Makarova</u>, 201 F.3d at 113)). In resolving a

Rule 12(b)(1) motion, a court may also "consider 'matters of which judicial notice may be

taken.'" <u>Greenblatt v. Gluck</u>, No. 03 Civ. 597 (RWS), 2003 WL 1344953, at *1 n.1 (S.D.N.Y.

Mar. 19, 2003) (quoting <u>Hertz Corp. v. City of New York</u>, 1 F.3d 121, 125 (2d Cir. 1993)).

      "A motion to dismiss a complaint for lack of standing is properly brought

pursuant to Rule 12(b)(1) . . . because it relates to the court's subject matter jurisdiction." <u>ED</u>

<u>Capital, LLC v. Bloomfield Inv. Res. Corp.</u>, 155 F. Supp. 3d 434, 446 (S.D.N.Y. 2016), <u>aff'd in</u>

<u>rel. part</u>, 660 F. App'x 27 (2d Cir. 2016).

    **B.**    <u>**Rule 12(b)(6)**</u>

      "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff," id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Under this standard, a plaintiff is required only to set forth a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. at 555, and a plaintiff's claims must be "plausible on [their] face," id. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557). Moreover, where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," id. at 570. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (alteration in original) (quoting Twombly, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers, 282 F.3d at 153; Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).

## II. STANDING

### A. Applicable Law

"'The doctrine of standing asks whether a litigant is entitled to have a federal court resolve [his, her, or its] grievance. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise.'" United States v. Suarez, 791 F.3d 363, 366 (2d Cir. 2015) (quoting Kowalski v. Tesmer, 543 U.S. 125, 128 (2004)). "Standing issues go to a court's subject matter jurisdiction and may be raised at any time." Fletcher v. City of New London, No. 16 Civ. 241 (MPS), 2017 WL 690533, at *3 (D. Conn. Feb. 21, 2017).

To establish constitutional standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citing Lujan, 504 U.S. at 560-61).

The requisite "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized[;] . . . and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted). In other words, "[t]he injury-in-fact requirement demands not only the existence of a legally cognizable injury, but also that the plaintiff itself be 'among the injured.'" Keepers, Inc. v. City of Milford,

807 F.3d 24, 42 (2d Cir. 2015) (quoting Lujan, 504 U.S. at 563).  Plaintiff bears the burden of establishing the elements of standing, and "at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."  Spokeo, 578 U.S. at 338 (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)).  Moreover, "district courts should be mindful that named plaintiffs in a class action 'must allege and show that they personally have been injured.'" (quoting Warth, 422 U.S. at 502) (emphasis in original).

Economic injuries are, of course, sufficient to meet the injury-in-fact requirement for purposes of standing.  See, e.g., Transunion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021) ("The most obvious [concrete injuries under Article III] are traditional harms, such as . . . monetary harms."); Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin., 710 F.3d 71, 85 (2d Cir. 2013) ("Even a small financial loss is an injury for purposes of Article III standing."); Alaska Elec. Pension Fund v. Bank of Am. Corp., 2016 WL 1241533, at *4 (S.D.N.Y. Mar. 28, 2016) (noting that "'paid too much' or 'received too little'" claims constitute "classic economic injury-in-fact").  A plaintiff can show an economic injury-in-fact by alleging "an overpayment or 'price premium,' whereby a plaintiff pays more than she would have but for the deceptive practice," Izquierdo v. Mondelez Int'l Inc., 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016), or by alleging that if she had "known the truth," she "would not have purchased a product." Colpitts v. Blue Diamond Growers, 527 F. Supp. 3d 562, 575 (S.D.N.Y. 2021).

**B.   Injury In Fact**

Columbia contends that Plaintiffs have not pled an injury-in-fact.  (See Def. Br. (Dkt. No. 44) at 13-17)[3]

---

[3] Citations to page numbers refer to the pagination generated by this District's Electronic Case Files ("ECF") system.

1. **Plaintiff's Allegations of Injury**

As to injury, Plaintiffs allege that if they had known of Columbia's misrepresentations in the data it provided to U.S. News, "they would not have applied for admission to Columbia." (Am. Cmplt. (Dkt. No. 32) ¶ 259) Plaintiffs also say that they would not have "agreed to pay premiums for tuition, fees and costs based on Columbia's [U.S. News] ranking." (Id. ¶ 260) According to Plaintiffs, they paid "premium rates for tuition" due to Columbia's "misrepresentations to [U.S. News], beginning in 2011 and each following year, [which] culminat[ed] in Defendant charging higher tuition (both undergraduate and graduate rates) than it otherwise would be able to." (Pltf. Opp. (Dkt. No. 45) at 14, 16; see also Am. Cmplt. (Dkt. No. 32) ¶ 247 ("Defendant's statements, representations and omissions were material to the decisions by Plaintiffs and the Class members to enroll and attend Columbia, and proximately caused them to pay premiums for tuition, fees and costs."); id. ¶ 260 ("If Plaintiffs and/or the Class members had knowledge of Defendant's unfair methods of competition and deceptive acts or practices described herein, they would not have agreed to pay premiums for tuition, fees and costs based upon Columbia's [U.S. News] ranking."))

According to Plaintiffs, Columbia

> misrepresented data to [U.S. News] which resulted in Defendant shooting up the national rankings and, owing to their higher rank, being able to charge higher tuition. Therefore, Plaintiffs' injury, as actually pled, resulted from Defendant's misrepresentations to [U.S. News], beginning in 2011 and each following year, culminating in Defendant charging higher tuition (both undergraduate and graduate rates) than it otherwise would be able to. This case focuses on concrete tuition increases traceable to Defendant's ascent in [U.S. News] rankings.

(Pltf. Opp. (Dkt. No. 45) at 13-14) In sum, from 2011 to 2022, "Columbia's ranking by [U.S. News] was a false representation of fact, based upon fabricated data provided to [U.S. News] by Defendant" (Am. Cmplt. (Dkt. No. 32) ¶¶ 64, 252), including misrepresentations regarding class size data and other "measures of quality." (Id. ¶¶ 29, 57, 64)

While Plaintiffs argue that they "have alleged [in the Amended Complaint] at least five metrics [that] were falsely reported by Columbia" to U.S. News (Pltf. Opp. (Dkt. No. 45) at 19), it is important to acknowledge that four of the five metrics cited by Plaintiffs are discussed in the Amended Complaint only in the context of the U.S. News 2021-22 rankings. As noted earlier, Plaintiffs all enrolled at Columbia prior to the publication of the 2021-22 rankings, and thus their decisions to attend Columbia could not have been influenced by the 2021-22 rankings. (See, e.g., Am. Cmplt. (Dkt. No. 32) ¶ 45, 49) And while the Amended Complaint goes on to allege that Columbia misreported data throughout the 2011 to 2022 time period, it does so only with respect to the class size metric. (Id. ¶¶ 57-220) As such, the only misrepresentation at issue for purposes of this lawsuit is class size.

As to the extent of their injury, Plaintiffs allege that it

> is measured by the incremental difference between the tuition and fees Plaintiffs and the Class members actually paid Defendant, and the amount of tuition and fees they would have paid Defendant or other institutions that they could have enrolled in, had the representations underlying Columbia's ranking been true.

(Id. ¶ 262)[4]

## 2.   Columbia's Arguments that Plaintiffs Have Not Pled an Injury in Fact

Columbia contends that Plaintiffs "each enrolled and attended Columbia prior to 2022," so "[n]one of them could have been exposed to, or relied upon, data reported to [U.S. News] for a 2022 ranking." (Def. Opp. (Dkt. No. 44) at 14) Columbia also argues that (1) "Plaintiffs fail to offer any plausible explanation as to how a single purportedly inaccurate input

---

[4]  As framed, this measure of damages is not intelligible. The Court understands Plaintiffs to be alleging, in part, that their measure of damages is the difference between what they paid Columbia and what they would have paid Columbia if Columbia had reported accurate data to U.S. News and received a ranking premised on accurate data. As to Plaintiffs' reference to "other institutions that they could have enrolled in," this Court does not hazard a guess.

[concerning class size] could have materially inflated the price of tuition"; and (2) "a 'price premium' theory is not cognizable in the educational context." (Id. at 15-16) Finally, Columbia contends that "Student[s] A, C, and D lack standing for the additional reason that they attended Columbia as graduate students," and the U.S. News Best National Universities rankings list addresses only undergraduate programs. (Id. at 17)

### a.  **Temporal Argument**

As noted above, Columbia argues that – because Plaintiffs enrolled in and attended Columbia prior to 2022, their decisions to attend Columbia could not have been influenced by the inaccurate data that Columbia reported to U.S. News for purposes of the 2021-22 U.S. News college rankings. (Def. Br. (Dkt. No. 44) at 14)

The Amended Complaint alleges that Columbia's reported data for the 2021-22 school year indicates that "83% of its classes had fewer than twenty (20) students in 2021-2022." (Am. Cmplt. (Dkt. No. 32) ¶ 59) "Columbia had the highest percentage of classes with fewer than twenty (20) students of any university [in U.S. News'] rankings in 2021-2022." (Id. ¶ 60) Columbia also reported – for purposes of the 2021-22 school year – that 100% of its faculty held "terminal degrees." (Id. ¶ 62) "After the publication of Professor Thaddeus's report . . . Columbia submitted revised data . . . admitting that [for purposes of the 2021-22 school year] only 57% of its classes had fewer than twenty (20) students in 2021-2022," and "that only 95% of its faculty held terminal degrees in 2021-2022." (Id. ¶¶ 61, 63)

In Columbia's September 9, 2022 press release acknowledging the University's submission of inaccurate data to U.S. News, the Provost blamed the underreporting of classes with more than twenty students, and the overreporting of faculty with terminal degrees, on "the prior methodologies used." (Id. ¶ 49)

In the Amended Complaint, Plaintiffs extrapolate from the inaccurate data that Columbia reported for the 2021-22 school year to argue that the University submitted false data concerning class size every year between U.S. News' 2011-12 rankings and 2021-22 rankings. (Am. Cmplt. (Dkt. No. 32) ¶¶ 64-220)  Given that the Provost blamed the submission of inaccurate data on the "methodologies" the University had been using to report information concerning, inter alia, class size, it is a reasonable inference that the data issues did not first emerge in 2021-22.  But the Amended Complaint does more than rely on that supposition.

In the Amended Complaint, Plaintiffs allege that the data set forth in the U.S. News college rankings (see id., Exhibit A) indicates generally that "[f]rom 2011-2012 to 2021-2022, there existed an inverse correlation between changes in a university's student/faculty ratio and changes in the percentage of its classes with fewer than twenty (20) students."  (Id. ¶ 65)  In other words, "[w]here a university's student/faculty ratio increased between two (2) years, the percentage of its classes with fewer than twenty (20) students generally decreased between those years" (id. ¶ 66), and where the student/faculty ratio decreased between two years, then the percentage of classes with fewer than twenty students increased between those years.  (Id. ¶ 67)  Where the ratio stayed constant, the percentage of classes with fewer than twenty students likewise remained constant.  (Id. ¶ 68)  Plaintiffs assert that this analysis "comports with common sense, because when there are fewer students per faculty member, class sizes tend to shrink and there tend to be more small classes."  (Id. ¶ 67)  But Columbia's data – as set forth in the U.S. News rankings – does not fit this pattern.

"In 2021-2022, Columbia represented to [U.S. News] that its student/faculty ratio was 6/1 and that 83% of its classes had fewer than twenty (20) students."  (Id. ¶ 69)  Columbia later admitted that during this period "only 57% of its classes had fewer than twenty (20)

students, but [nonetheless continued to] affirm[] that its 2021-2022 student/faculty ratio was 6/1." (Id.)  According to Plaintiffs, Columbia's U.S. News ranking for every school year from 2011-12 through 2021-22 shows a student/faculty ratio of 6/1.  (See id. ¶¶ 78, 93, 108, 123, 138, 153, 168, 183, 198, 213)  And during that same period, for every school year, the percentage of classes that had fewer than 20 students was consistently "at or near 83%."  (See id. ¶¶ 78 (82% in 2020-2021), 93 (82% in 2019-2020), 108 (82% in 2018-2019), 123 (83% in 2017-2018), 138 (83% in 2016-2017), 153 (82% in 2015-2016), 168 (82% in 2014-2015), 183 (80% in 2013-2014), 198 (81% in 2012-2013), 213 (80% in 2011-2012))

According to Plaintiffs, given that (1) Columbia admitted in 2022 that with a 6/1 student/faculty ratio only 57% of its classes had fewer than 20 students, and (2) Columbia's previous ten years of reported data show an identical student/faculty ratio and a nearly identical percentage of classes with fewer than twenty students, "Columbia's representations to U.S. News [about class size] from 2011-2012 through 2021-2022 were [likely] false." (Id. ¶ 71)

"When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000).  Drawing all reasonable inferences in favor of Plaintiffs, the Court concludes that they have adequately alleged that Columbia was reporting inaccurate data to U.S. News for each of the U.S. News' rankings between 2011-12 and 2021-22, and that the inaccurate data would have had some effect on Columbia's ranking during these years.

### b.    Plausibility of Plaintiffs' Claimed Injury

In arguing that Plaintiffs lack standing, Columbia contends that Plaintiffs have not adequately pled how the false data Columbia supplied to U.S. News affected the U.S. News

rankings.  Columbia further contends that, under New York law, a "price premium" theory of injury is not cognizable in the educational context.  (Def. Br. (Dkt. No. 44) at 15-16)  Finally, Columbia argues that "Plaintiffs' allegation[s] [of injury are] entirely implausible."  (Id. at 15)

As an initial matter, the plausibility of Plaintiffs' allegations of injury presents an issue under Rule 12(b)(6) and not under Rule 12(b)(1).  See Ross v. Bank of Am., N.A.(USA), 524 F.3d 217, 225 (2d Cir. 2008) ("plausibility is not at issue at this point, as we are considering only Article III standing").  The Second Circuit has also instructed that "[i]njury in fact is a low threshold" that "'need not be capable of sustaining a valid cause of action.'"  Ross, 524 F.3d at 222 (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006)).

In line with this precedent, courts in this Circuit have consistently ruled that plaintiffs satisfy the requirements of Article III standing when they plead that defendants' misrepresentations caused them to purchase a product that they otherwise would not have purchased.  See, e.g., Morrow v. Ann Inc., 2017 WL 363001, at *3 (S.D.N.Y. Jan. 24, 2017) ("Plaintiffs allege that they would not have bought the products absent Ann's advertising, which caused them to spend money they would otherwise not have spent.  This injury is concrete, and while it may ultimately prove insufficient to justify relief under the statutes at issue, it is sufficient to confer constitutional standing."); Brown v. Kerry Inc., 20 Civ. 9730 (PGG) (JLC), 2021 WL 5446007, at *3 (S.D.N.Y. Nov. 22, 2021), report and recommendation adopted, 2022 WL 669880 (S.D.N.Y. Mar. 7, 2022) ("Allegations that a plaintiff would not have bought the product . . . had she known the truth behind the misrepresentation satisfies an actual injury claim at the motion to dismiss stage."); Colpitts v. Blue Diamond Growers, 527 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) ("allegation[s] that a plaintiff would not have purchased a product . . . comfortably satisf[y] the injury-in-fact prong of Article III standing").

Here, the product that Plaintiffs allege they purchased was a Columbia education. And in the Amended Complaint, Plaintiffs assert, <u>inter alia</u>, that they would not have purchased this product had they known about Columbia's misrepresentations. The Court concludes that – for purposes of standing – Plaintiffs have sufficiently alleged an injury in fact premised on the claim that – had they known of Columbia's misrepresentations – they would not have sought admission to Columbia, and thus would never have paid tuition to the University. (Am. Cmplt. (Dkt. No. 32) ¶ 259)

c.   **Payment of Premium Price as Injury**

In the Amended Complaint, Plaintiffs allege that they "would not have agreed to pay premiums for tuition, fees and costs based upon Columbia's [U.S. News] ranking" had they known that Columbia's ranking was premised on inaccurate data. (<u>Id.</u> ¶ 260) "Allegations that a plaintiff would not have bought the product or paid less for it had she known the truth behind the misrepresentation satisfies an actual injury claim at the motion to dismiss stage." <u>Brown</u>, 2021 WL 5446007, at *3. And contrary to Columbia's arguments (<u>see</u> Def. Br. (Dkt. No. 44) at 15-16), "[a] plaintiff need not specify in her pleading the exact amount of price premium that she paid." <u>Id.</u>; <u>see also</u> <u>Fishon v. Peloton Interactive, Inc.</u>, 620 F. Supp. 3d 80, 94 (S.D.N.Y. 2022) ("Defendant . . . point[s] to what it says Plaintiffs did not plead – the price they paid for their bikes, how advertisements affected the price of Peloton's products, or how much competitors charged for similar products. This argument is unavailing at [the motion to dismiss] stage.").

Columbia argues, however, that Plaintiffs have not "identif[ied] even a single marketing tool, statement, representation, or omission to which they were personally exposed." (Def. Br. (Dkt. No. 44) at 15) But Plaintiffs have alleged that "[u]niversities, including Columbia, intentionally use U.S. News' rankings as marketing tools to recruit students," and that

"[a]s part of its marketing practices and recruitment efforts, Defendant made numerous statements, representations, and omissions to the public, including Plaintiffs and the Class members, with respect to Columbia's [U.S. News] ranking." (Am. Cmplt. (Dkt. No. 32) ¶ 40, 245) And Plaintiffs further allege that Columbia's use of the U.S. News rankings in its marketing efforts and public statements permitted it to "justify rising tuition fees" and charge a price premium. (Am. Cmplt. (Dkt. No. 32) at 20) These allegations support Plaintiffs' assertion of injury for purposes of demonstrating Article III standing.

In any event, "Defendant is incorrect that the only way to demonstrate standing is to show that Plaintiffs saw and relied on the misrepresentations at issue." Fishon, 620 F. Supp. 3d at 95.

> Just as the consumer who purchases a pen whose price is inflated by the false characterization of it as being rugged is injured as a result of the misrepresentation to the market even if he personally is oblivious to it, so too the consumer who purchases a [product] whose price is inflated as a result of a false marketing campaign suffers an injury traceable to that campaign even if the misrepresented fact was not important to her.

Id. "Plaintiffs' personal reliance on the alleged misrepresentation is irrelevant to their individual constitutional standing when they alleged – as they do here – that they were injured as a result of the effect that Defendant's misrepresentations had on the market and the price premium that those misrepresentations caused them to pay." Id.

The Court concludes that the Amended Complaint's allegations regarding the payment of a price premium are adequate to demonstrate Article III standing.

### d.     Claims by Graduate Students A, C, and D

Because Plaintiffs Student A, Student C, and Student D are Columbia graduate students rather than Columbia undergraduate students, Columbia argues that they lack standing. (Def. Opp. (Dkt. No. 44) at 17)

17

The U.S. News Best National Universities rankings address undergraduate programs at colleges and universities.  (Am. Cmplt., Ex. A (Dkt. No. 32) at 64-75)  Plaintiffs argue, however, that the rankings apply to graduate students because they are entitled "'Best National University Rankings,' not 'Best Undergraduate College Rankings.'"  (Pltf. Opp. Br. (Dkt. No. 45) at 16 n.3)  This argument is not persuasive.

As an initial matter, Plaintiffs' argument that the U.S. News rankings address graduate programs contradicts the Amended Complaint's allegations, which are premised on rankings of undergraduate programs.  For example, the class size data issue involves the percentage of <u>undergraduate</u> classes that enroll fewer than twenty students.  (Am. Cmplt. (Dkt. No. 32) ¶ 45(a))  And the Provost's June 30, 2022 statement cited by Plaintiffs is entitled, "Provost Mary Boyce's Statement Regarding <u>U.S. News and World Report's Undergraduate Survey</u>."  (<u>Id.</u> ¶ 47 (emphasis added))  The rankings themselves state that U.S. News has "assessed more than 1,500 of the country's <u>four-year colleges and universities</u>."  (<u>Id.</u> Ex. A (emphasis added))  And all of the metrics considered in the rankings apply only to undergraduate programs, including SAT/ACT college entrance exam scores and the average first-year student retention rate.  (<u>Id.</u>)

The law regarding Article III standing dictates that the "injury in fact" must be "fairly . . . trace[able] to the challenged action."  <u>Lujan</u>, 504 U.S. at 560 (alteration in original).  Students A, C, and D may allege that they paid tuition to Columbia, but the pertinent question for standing purposes is whether they paid tuition to attend Columbia's undergraduate college.  Based on the Amended Complaint's allegations (Am. Cmplt. (Dkt. No. 32) ¶¶ 13, 15-16 (asserting that Plaintiff Students A, C, and D were enrolled as graduate students at Columbia)), the answer is no.  Because Students A, C, and D did not pay tuition to attend Columbia's

undergraduate college, they cannot proceed with a legal claim premised on the notion that Columbia reported inaccurate data regarding certain "measures of quality" regarding the undergraduate college.

In sum, the claims of Students A, C, and D will be dismissed for lack of standing. The Court concludes that Plaintiffs Campbell and Student B have demonstrated standing.

### III.   WHETHER PLAINTIFFS HAVE STATED A CLAIM UNDER NEW YORK'S GENERAL BUSINESS LAW

In arguing that Plaintiffs' GBL claims should be dismissed under Rule 12(b)(6), Columbia contends that (1) Plaintiffs' claims are time-barred; (2) "Plaintiffs do not allege that they were exposed to a misrepresentation"; and (3) Plaintiffs' "theory of damages is impermissibly speculative." (Def. Br. (Dkt. No. 33) at 18, 26-28)

### A.   Applicable Law

GBL Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce," while GBL Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce." GBL §§ 349, 350. "'The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to [§] 349,' . . . and therefore the Court will merge its analysis of the two claims." Cosgrove v. Oregon Chai, Inc., 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (quoting Goshen v. Mut. Life Ins. Co. of N.Y., 98 N.Y.2d 314, 324 n.1 (2002)).

To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Wynn v. Topco Assocs., LLC, 19 Civ. 11104 (RA), 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (quoting Orlander

v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)).[5]  To survive a motion to dismiss, "plaintiffs must do more than plausibly allege that a [representation] might conceivably be misunderstood by some few consumers." Twohig v. Shop-Rite Supermarkets, Inc., 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (alteration and internal quotation marks omitted) (quoting Sarr v. BEF Foods, Inc., 18 Civ. 6409 (ARR) (RLM), 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020)).  Plaintiff must "plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled." Id. (quoting Sarr, 2020 WL 729883, at *3).  Finally, "[a]lthough the question of whether a business practice or advertisement is misleading to a reasonable consumer is generally a question of fact, it is 'well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer.'" Id. (internal quotations omitted).

As to the statute of limitations for GBL claims, "[a]ctions brought pursuant to Section 349 [and Section 350] must be commenced within three years of the date of accrual, which occurs when plaintiff is injured by the deceptive act or practice that violated the statute." Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2, 419 F. Supp. 3d 668, 699 (S.D.N.Y. 2019) (quoting Statler v. Dell, Inc., 841 F. Supp. 2d 642, 648 (E.D.N.Y. 2012))  "Accrual is not dependent upon any later date when discovery of the alleged deceptive practice is said to occur." Statler, 775 F. Supp. 2d at 484; Wender v. Gilberg Agency, 276 A.D.2d 311, 312 (1st Dept. 2000) (holding that for claims under GBL 349 "the date of discovery rule is not applicable and cannot serve to extend that limitations period.").

---

[5]  Defendant does not dispute the Plaintiffs have adequately pled the first two elements of a GBL claim:  consumer-oriented conduct and conduct that was materially misleading.  As discussed below, however, Defendant contends that Plaintiffs have not adequately pled an injury.  (Def. Br. (Dkt. No. 44) at 18-20)

B.      **Analysis**

1.      **Whether Plaintiffs' GBL Claims Are Time-Barred**

Plaintiff Campbell attended Columbia University from 2014 to 2018, and filed his complaint on July 12, 2022.  (Am. Cmplt. (Dkt. No. 32) ¶ 12; Cmplt. (Dkt. No. 1))  Plaintiff Student B attended the University from 2014 to 2020, and filed his complaint on August 2, 2022. (Am. Cmplt. (Dkt. No. 32) ¶ 14; 22 Civ. 6507, Cmplt. (Dkt. No. 1))

Columbia contends that "Plaintiffs' alleged injury occurred at the latest when they enrolled at Columbia."  (Def. Br. (Dkt. No. 44) at 27)  Plaintiffs respond by "invok[ing] the 'continuing violation' doctrine, which 'is usually employed where there is a series of continuing wrongs and [which] serves to toll the running of a period of limitations to the date of the commission of the last wrongful act.'"  Ramiro Aviles v. S & P Glob., Inc., 380 F. Supp. 3d 221, 289 (S.D.N.Y. 2019) (quoting Henry v. Bank of Am., 147 A.D.3d 599 (1st Dept. 2017)).

In alleging a "continuing violation," Plaintiffs cite Harvey v. Metropolitan Life Insurance Co., 21 Misc. 3d 1142(A) (N.Y. Cnty. Sup. Ct. 2005).  In Harvey, plaintiff alleged that he

> purchased a Flexible-Premium Life Insurance Policy from MetLife in 1985, when he was 35 years old, married with two children, aged 11 and 12 years old.  The Child Rider, contained in the policy, insured Harvey's children until they reached the age of 25.  The $84 monthly premium was for a life insurance benefit of $50,000, and the Child Rider.  According to the policy, the premium was paid into the policy's "Accumulation Fund."  The cost of the Child Rider was to have been deducted on a monthly basis from the Accumulation Fund.  The complaint alleges that the cost of $1000 of term coverage under the Child Rider was never to exceed $.60 for each $1000 of coverage.  MetLife did not provide monthly statements of the amounts deducted from the Accumulation Fund for the Child Rider.

> Plaintiff's children turned 25 years of age in 1998 and 1999, respectively. The children's eligibility for coverage under the Child Rider expired on their respective 25th birthdays.  However, MetLife continued to charge plaintiff for the Child Rider, from 1999 until he surrendered the policy in 2003, despite the fact that none of his children were eligible for coverage during that period of time.

Id. at *1-2.  Harvey "allege[d] that defendant's failure to notify him that coverage under the Child Rider had expired, and its continued collection of premiums after coverage was no longer in effect, violated General Business Law § 349(a) (GBL § 349(a)), and constituted fraud." Id. at 2.

In rejecting the insurer's argument that plaintiff's claim was time-barred, the court concluded that Harvey's claim fell within the "continuing violation doctrine":

> The "continuing violation" doctrine is usually employed where there are a series of continuing wrongs, effectively tolling the limitations period until the date of the commission of the last wrongful act.  Selkirk v. State of New York, 249 A.D.2d 818 (3d Dept 1998).  A finding of a continuing violation will be predicated on a showing of continuing unlawful acts.  Id.  Here, Harvey has met this standard by alleging that each deduction from the policy's Accumulation Fund, after the youngest child turned 25, constituted an unlawful act.  Since Harvey alleges that deductions for the Child Rider continued until he surrendered the policy, in 2003, this action, commenced in 2004, and the alleged violation of GBL §349, were interposed in a timely fashion.

Id. at *4.

Here, Plaintiffs allege that for each year that they attended Columbia they paid tuition that reflected a "price premium" tied to the false data that Columbia submitted to U.S. News each year.  Under Harvey's logic, a wrongful act occurred each time Defendant charged Plaintiffs the inflated tuition.  Accordingly, each Plaintiff's last injury took place when they made their last tuition payment to Columbia.  Because Plaintiff Campbell's last tuition payment was made in 2018, and his complaint was not filed until 2022 (See Am. Cmplt. (Dkt. No. 32) ¶ 12; Cmplt. (Dkt. No. 1)), his GBL claims are – absent equitable tolling – time-barred.  Because Plaintiff Student B's last tuition payment was made in 2020 and his complaint was filed in 2022 (See Am. Cmplt. (Dkt. No. 32) ¶ 14; 22 Civ. 6507, Cmplt. (Dkt. No. 1)), his GBL claims are not time-barred.

Plaintiffs argue that equitable tolling applies to their GBL claims.[6]  (Pltf. Opp. (Dkt. No. 45) at 30)  "Under New York law, '[e]quitable estoppel [or tolling] may arise when the defendant misrepresents to the plaintiff the time within which he may begin suit.  Equitable estoppel may also arise when affirmative fraudulent statements are made which conceal from the plaintiff facts essential to make out the cause of action.'"  Abercrombie, 438 F. Supp. 2d at 264 (quoting Renz v. Beeman, 589 F.2d 735, 750 (2d Cir. 1978)).  "However, without adequate pleading, the issue is not properly raised and therefore cannot defeat a motion to dismiss based on statute of limitations grounds."  Id. at 265.  Moreover, "equitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action."  Id. (quoting Kaufman v. Cohen, 307 A.D.2d 113 (1st Dept. 2003)).  "In addition to this requirement, any claim that a defendant's fraudulent concealment bars invocation of a statute of limitations defense must comport with Fed. R. Civ. P 9(b) in that it must be sufficiently particularized."  Id. at 266.

"The doctrine of equitable estoppel usually comes into play when some conduct by a defendant after his initial wrongdoing has prevented the plaintiff from discovering or suing upon the initial wrong."  Smith v. Smith, 830 F.2d 11, 13 (2d Cir. 1987).  "[E]quitable tolling is only appropriate in rare and exceptional circumstance[s], in which a party is prevented in some extraordinary way from exercising his rights."  Vincent v. Money Store, 304 F.R.D. 446, 458 (S.D.N.Y. 2015) (quoting Zerilli-Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003)).

---

[6] "Equitable estoppel is sometimes used interchangeably with the term 'equitable tolling' in New York case law."  Abercrombie v. Andrew Coll., 438 F. Supp. 2d 243, 265 n.22 (S.D.N.Y. 2006).

"In some cases, however, the plaintiff may be able to prove this element by showing that 'the wrong itself was of such a nature as to be self-concealing.'" Vincent, 304 F.R.D. at 458 (quoting State of N.Y. v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988)). "Principal among these are bid-rigging and price-fixing schemes: 'scheme[s] [that] necessarily include[ ] concealment of the existence of [the] conspiracy,' and thus 'proof of the conspiracy itself suffice[s] to prove concealment by the coconspirators.'" Id. (quoting Hendrickson Bros., 840 F.2d at 1084). "Because accomplishing those schemes require affirmative acts of concealment, the plaintiffs in those cases do not need to show additional 'independent affirmative steps' of concealment." Id. (citing In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig., 00 Civ. 7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004))

Here, Columbia's misrepresentations to U.S. News provide the basis for both Plaintiffs' GBL cause of action and their equitable tolling claim. (See Am. Cmplt (Dkt. No. 32) ¶¶ 251-255 (alleging that "Defendant violated GBL § 349 by engaging in deceptive acts or practices," including "false representations and misreporting of critical data to [U.S. News]"); see id. ¶ 274 ("Defendant has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding its class sizes, faculty resources, student-faculty ratios, graduation and retention rates, and financial resources supportive of its [U.S. News'] ranking were material and likely to deceive a reasonable consumer."); Pltf. Opp. (Dkt. No. 45) at 13 ("the premise of this action is very simple:  Defendant misrepresented data to U.S. News"); id. at 30-31 (asserting that Columbia's misrepresentations to U.S. News also justify equitable tolling, because "Plaintiffs clearly allege misrepresentations by numerous Columbia employees in internally gathering and submitting false data to [U.S. News]," and "Plaintiffs had no way of discovering [the misrepresentations]")  Plaintiffs' equitable tolling argument thus runs afoul of black letter law

stating that "equitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action." Abercrombie, 438 F. Supp. 2d at 265 (quoting Kaufman, 307 A.D.2d 113).

And while equitable tolling may apply where a plaintiff "'show[s] that it would have been impossible for a reasonably prudent person to learn' about his or her cause of action," Pearl v. City of Long Beach, 296 F.3d 76, 85 (2d Cir. 2002) (emphasis in original) (quoting Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir. 1985)), Plaintiffs have not pled facts plausibly demonstrating that Columbia's misrepresentations would have been impossible to detect prior to July 12, 2022, or August 2, 2022, when Plaintiffs filed their respective complaints. (Cmplt. (Dkt. No. 1); 22 Civ. 6567, Cmplt. (Dkt. No. 1))  Indeed, the Amended Complaint's allegations concerning Professor Thaddeus' article – which is based on publicly available data – demonstrate the contrary.

Plaintiffs also do not provide a factual basis for equitable tolling in their pleadings.  As discussed above, the facts justifying application of equitable tolling must be pled in the complaint.  In the absence of such pleading, equitable tolling cannot be raised. Abercrombie, 438 F. Supp. 2d at 265 ("without adequate pleading, [equitable tolling] is not properly raised and therefore cannot defeat a motion to dismiss based on statute of limitations grounds"); see also Dep't of Econ. Dev. v. Arthur Andersen & Co., 747 F. Supp. 922, 943 (S.D.N.Y. 1990) (dismissing claim as time-barred because plaintiff made no allegation in complaint that "its failure to timely institute its third-party action was due to its justified reliance upon a misrepresentation" by adversary); Moll v. U.S. Life Title Ins. Co. of N.Y., 700 F. Supp. 1284, 1293 (S.D.N.Y. 1988) ("Plaintiffs have not alleged that defendant caused them to delay in bringing suit on a known cause of action.  On the contrary, plaintiffs repeatedly emphasize that

they did not discover the alleged . . . violations until long after the limitations period had expired . . . . Equitable estoppel is therefore not appropriate in this case.").

Nothing in Plaintiffs' pleadings suggests that Columbia's misrepresentations to U.S. News required or involved affirmative acts of concealment. According to Plaintiffs' pleadings, Columbia merely provided inaccurate data to U.S. News. In any event, "any claim that a defendant's fraudulent concealment bars invocation of a statute of limitations defense must comport with Fed. R. Civ. P 9(b) in that it must be sufficiently particularized." Abercrombie, 438 F. Supp. 2d at 266. Plaintiffs have not pled a "sufficiently particularized" claim of fraudulent concealment and have not pled that Columbia's misrepresentations were self-concealing.

The Court concludes that equitable tolling does not apply, and that accordingly Plaintiff Campbell's GBL claims are time-barred.

**2.   Causation**

Columbia argues that, in order to sufficiently allege an injury under New York's GBL, Plaintiffs must plead causation, "which at a minimum requires allegations of personal exposure to the alleged deception." (Def. Br. (Dkt. No. 44) at 19) Because Plaintiffs "do not allege that they personally were exposed to the allegedly inaccurate reporting," their GBL claims fail. (Id.)

Plaintiffs do not respond to Columbia's causation argument. They instead address materiality (see Pltf. Opp. (Dkt. No. 45) at 18), which is a point that Defendant has not raised.

Columbia is correct in asserting that the Amended Complaint does not allege that Plaintiffs reviewed any Columbia marketing or advertisement referencing the U.S. News rankings. But none of the cases that Defendant cites (see Def. Br. (Dkt. No. 44) at 19) support

dismissal of a GBL claim on that ground.  Indeed, none of these cases involves a "price premium" theory of injury.  See, e.g., Oden v. Bos. Sci. Corp., 330 F. Supp. 3d 877, 885 (E.D.N.Y. 2018), adhered to on reconsideration, 18 Civ. 334 (SJF) (SIL), 2019 WL 1118052 (E.D.N.Y. Mar. 11, 2019) (dismissing GBL §§ 349 and 350 claims regarding a claim of "Trusted Performance" for an allegedly faulty medical device); Gerstle v. Nat'l Credit Adjusters, LLC, 76 F. Supp. 3d 503, 513 (S.D.N.Y. 2015) (dismissing a GBL § 349 claim premised on allegation that debt collector fraudulently obtained payment from plaintiff's bank account); Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc., 172 A.D.3d 405, 406 (1st Dept. 2019), aff'd, 37 N.Y.3d 169 (2021) (dismissing GBL § 349 claim for the purchase price of a book that contained inaccuracies and omissions).

Defendant's cases instead involve GBL claims and alleged injuries that are premised on exposure to a misrepresentation.  In such cases, a plaintiff who has purchased a defective product cannot have been injured by an advertisement that he never saw.  Indeed, plaintiff's injury under the GBL arises from an expectation – based on an advertisement – that the purchased product will be suitable for the purpose for which it was purchased.  See Oden, 330 F. Supp. 3d at 885.

The injury alleged here is of a different nature.  Plaintiffs contend that Columbia's alleged misrepresentations to U.S. News allowed it to charge a premium for tuition and, as a result, Plaintiffs paid a higher price to attend Columbia.  "A 'price premium' injury exists when a misrepresentation causes the plaintiff to overpay for a product. . . . A price premium injury may be alleged by showing either that because of a misrepresentation the plaintiff received a good worth less than what he paid for, i.e., a good of inferior quality, or that because of a

misrepresentation the plaintiff paid an inflated price." Belcastro v. Burberry Ltd., 16 Civ. 1080

(VEC), 2017 WL 5991782, at *4 (S.D.N.Y. Dec. 1, 2017) (internal citation omitted).

Stated differently,

> [a] plaintiff can plead injury and causation for purposes of Sections 349 and 350
> in at least one of two ways. First, the plaintiff can plead that she was exposed to a
> material deceptive act and relied on that misrepresented fact to her detriment. The
> plaintiff is directly injured when she pays a higher price than she otherwise would
> have paid based on her belief in the fact that is misrepresented. . . . Second and
> importantly, however, a plaintiff can also plead both injury and causation under
> GBL §§ 349 and 350, by alleging that the defendant's misleading or deceptive
> advertising campaign caused a price premium, that the price premium was
> charged both to those who saw and relied upon the false representations and those
> who did not, and that, as a result of the price premium, plaintiff was charged a
> price she would not otherwise have been charged but for the false campaign.

Fishon, 620 F. Supp. 3d at 99-100.

The rationale for allowing a plaintiff to plead a price premium injury – even

though he or she never saw any relevant advertising or marketing – is that "reliance is not an

element of a section 349 claim." Stutman v. Chem. Bank, 95 N.Y.2d 24, 29 (2000).  Because

there is no reliance requirement under GBL § 349, there is no need for a GBL § 349 plaintiff to

have seen a misrepresentation in a "price premium" case, so long as plaintiff properly alleges

that defendant's misrepresentation caused the unjustified price premium.

In sum, "[u]nder this theory of injury, an individual's awareness of an alleged

misrepresentation plays no role in the causation analysis because reliance plays no role in it."

Fishon, 620 F. Supp. 3d at 103; cf. Sharpe v. A&W Concentrate Co., 19 Civ. 768 (BMC), 2021

WL 3721392, at *4 (E.D.N.Y. July 23, 2021) (rejecting defense argument that consumers must

have been personally exposed to alleged misrepresentation as "another attempt to sneak in

reliance"); Hasemann v. Gerber Prod. Co., 331 F.R.D. 239, 266 (E.D.N.Y. 2019) ("[W]here

reliance is not at issue, the individual reason for purchasing a product becomes irrelevant and

subsumed under the reasonable consumer standard, i.e., whether the deception could likely have

misled someone, and not, whether it in fact did."). "The operative question is whether a plaintiff suffered an injury because of a defendant's misrepresentation; it is not whether that injury was tied to plaintiff's reliance on the misrepresentation." Fishon, 620 F. Supp. 3d at 103. As the Fishon court notes, "[i]t may be difficult in the end for Plaintiffs to prove those claims (or even to present sufficient facts to create a jury question), but Plaintiffs have pleaded enough to be permitted to try." Id. at 104.

For these reasons, the Court concludes that the Amended Complaint adequately alleges causation.

### 3.    Damages

Columbia argues that Plaintiffs' "GBL claims fail for the additional reason that Plaintiffs' theory of damages is impermissibly speculative." (Def. Br. (Dkt. No. 44) at 20)

As discussed above, the Amended Complaint alleges that

> Defendant's violations of GBL § 349, as described herein, have directly caused Plaintiffs and Class members to have suffered ascertainable loss for damages measured by the incremental difference between the tuition and fees Plaintiffs and the Class members actually paid Defendant, and the amount of tuition and fees they would have paid Defendant or other institutions that they could have enrolled in, had the representations underlying Columbia's ranking been true.

(Am. Cmplt. (Dkt. No. 32) ¶ 262)

Plaintiffs argue that these

> damages are ascertainable and can be quantified functionally, comparatively, and through the use of experts. The challenge of calculating damages, when actual damages exist, does not negate the ability to bring a claim. Plaintiffs bear the ultimate burden of proof, but have sufficiently pled the damages at this stage to overcome a motion to dismiss.

(Pltf. Opp. (Dkt. No. 45) at 12)

In arguing that Plaintiffs' damage claim is speculative, Columbia relies primarily on Gomez-Jimenez v. New York L. Sch., 36 Misc. 3d 230, 250 (N.Y. Cnty. Sup. Ct. 2012), aff'd,

103 A.D.3d 13 (1st Dept. 2012).  In <u>Gomez-Jimenez</u>, Plaintiffs argued that New York Law School

> has been able to attract a large number of applicants and charge an expensive price for its educational services because the school has disseminated . . . misleading information about its graduates' employment profiles.  Allegedly, the misleading information has caused prospective students to misjudge post-graduate employment prospects and commit to earning a NYLS degree which has less marketplace currency than they reasonably had expected.  Plaintiffs allege that many of the school's working graduates in the legal sector hold part-time or temporary employment, paying barely enough to service the debt incurred to finance their law school tuition and expenses.

<u>Id.</u> at 233.

> While plaintiffs in <u>Gomez-Jiminez</u> did not
>
> deny[] that they received a quality education at NYLS, [they] ask[ed] [the] court to measure the "true value" of a NYLS degree which allegedly misrepresented the chances that NYLS graduates could obtain full-time, permanent employment for which a J.D. degree was required or preferred.  On oral argument, plaintiffs emphasized:
>
>> "Your Honor, we're here today not talking about whether or not New York Law School guaranteed a job to our clients.  That claim appears nowhere in the complaint. . . . This is a case about a product being mislabeled; and because that product is mislabeled, the law school can charge a premium for it. . . . We believe through expert testimony . . . you can measure the difference between a degree where you have a 40 percent or 30 percent chance of getting a job, and the degree that New York Law School misled . . . our clients in getting which was a degree where you have a 90 percent chance of a job[.]"
>
> The starting point of any such measurement is beyond this court, and perhaps this is why plaintiffs fail to allege any method by which any theoretical damages ever could be calculated.

<u>Id.</u> at 250.  Concluding that calculation of plaintiffs' damages would "require the court to engage in naked speculation," the court dismissed plaintiffs' GBL §§ 349 and 350 claims.  <u>Id.</u> at 252.

> <u>Gomez-Jimenez</u> is not persuasive here.

As an initial matter, while the First Department affirmed the dismissal in Gomez-Jimenez, it did so on different grounds, and did not address the lower court's holding regarding speculative damages.  See Gomez-Jimenez, 103 A.D.3d 13 (1st Dept. 2012).

Moreover, Gomez-Jimenez's holding is predicated on Mihalakis v. Cabrini Med. Ctr. (CMC), 151 A.D.2d 345 (1st Dept. 1989), which involved a fraud claim and not a claim under the GBL.  See Gomez-Jimenez, 36 Misc. 3d at 249 ("[T]he court is of the opinion that the general rule set forth in Mihalakis is applicable here.").  In Mihalakis, the court dismissed a fraud claim based on a hospital's physician internship program, finding "that the loss . . . would have to be measured by the difference between the value of the internship program provided by defendants and the value of an internship program having the characteristics that defendants represented to plaintiff [the hospital] had but did not.  We think it evident that any such measurement must be rejected as speculative."  Mihalakis, 151 A.D.2d at 346. Given the very different pleading standards that apply in fraud cases and cases brought under the GBL, Mihalakis is not applicable to claims brought under the GBL.  See Goldemberg v. Johnson & Johnson Consumer Companies, Inc., 8 F. Supp. 3d 467, 481 (S.D.N.Y. 2014) (distinguishing actions brought under the New Jersey Consumer Fraud Act, "under which plaintiffs must satisfy the heightened pleading standard of Rule 9(b)," from claims brought under GBL § 349, where "no such heightened standard applies").[7]

---

[7]  In Bevelacqua v. Brooklyn L. Sch., 39 Misc. 3d 1216(A) (Kings Cnty. Sup. Ct. 2013), also cited by Defendant (Def. Br. (Dkt. No. 44) at 20), the court dismissed fraud and GBL claims premised on Brooklyn Law School marketing material regard job placement post-graduation.  In dismissing plaintiffs' claims, the court concluded that plaintiffs had not pled facts demonstrating that the law school's statements about job placement were deceptive.  In a footnote citing Mihalakis, however, the court remarks that "the manner in which plaintiffs measure their damages, i.e., the 'difference between the inflated tuition paid by Class members based on [Brooklyn Law School's] material misrepresentations . . . and the true value of a [Brooklyn Law

Finally, and most importantly, courts in this District have held that at the pleading stage of a GBL case, "[t]here is no requirement that Plaintiff specify the exact amount of the price premium that he paid, or a comparable product." Izquierdo v. Panera Bread Co., 450 F. Supp. 3d 453, 465 (S.D.N.Y. 2020). It follows that at the pleading stage, plaintiff need not articulate precisely how damages will be calculated. It is instead sufficient to plead an injury and "a demand for the relief sought." Fed. R. Civ. P. 8(a). While, as noted above, the Amended Complaint does not articulate an intelligible model by which damages will be calculated, that defect does not require dismissal at this stage of the proceedings. See, e.g., Fishon on Interactive, Inc., 19 Civ. 11711 (LJL), 2020 WL 6564755, at *11 (S.D.N.Y. Nov. 9, 2020) (denying motion to dismiss GBL claims premised on fitness company's alleged misrepresentations regarding the number of "live streaming and on-demand" classes it offered; finding sufficient plaintiffs' allegations that they "would not have purchased [a membership]" or "would not have purchased [a membership] on the same terms, if they knew the truth," while acknowledging "that at the proof stage Plaintiffs will face challenges establishing either of their theories of injuries"); Reyes v. Upfield US Inc., 22 Civ. 6722 (KMK), 2023 WL 6276685, at *4 (S.D.N.Y. Sept. 26, 2023) (holding "at th[e] early [motion to dismiss] stage of the case" that plaintiff had adequately pled price premium injury where she alleged that she would not have purchased the product, or would not have paid as much, "if she knew the representations were false and misleading"); Brown v. Kerry Inc., 20 Civ. 9730 (PGG) (JLC), 2021 WL 5446007, at *3 (S.D.N.Y. Nov. 22, 2021), report and recommendation adopted, 2022 WL 669880 (S.D.N.Y.

---

School] degree' (Prayer for Relief ¶ 3), adds yet another layer of 'improper speculation,' requiring dismissal of the claims." Id. at *9 n.13. Given the lack of any explanation or analysis as to why the alleged "speculative damages" claim required dismissal of plaintiffs' GBL claims, Bevelacqua is not persuasive here.

Mar. 7, 2022) ("A plaintiff need not specify in her pleading the exact amount of price premium that she paid.").

   While it may later prove difficult or impossible to calculate damages in this case, that possibility does not justify dismissal at this stage of the proceedings.

## IV. **BREACH OF CONTRACT**

   Columbia seeks dismissal of Plaintiffs' breach of contract claim, arguing that (1) it constitutes "an impermissible attempt to recover for educational malpractice"; (2) Plaintiffs have not identified any contractual promise that was broken; and (3) "Plaintiffs' alleged damages are entirely speculative." (Def. Br. (Dkt. No. 44) at 21)

### A. **Applicable Law**

   "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994) (citing Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co., 612 F. Supp. 134, 137-38 (S.D.N.Y.1985)).

   New York law also recognizes the existence of "an implied contract between a student and their college or university." Goldberg v. Pace Univ., 535 F. Supp. 3d 180, 193 (S.D.N.Y. 2021), aff'd, 88 F.4th 204 (2d Cir. 2023). "When a student enrolls at a university, an implied contract arises: if the student complies with the terms prescribed by the university, she will obtain the degree she seeks." Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998) "The essence of the implied contract is that an academic institution must act in good faith in its dealings with its students." Olsson v. Bd. of Higher Ed., 49 N.Y.2d 408, 414 (1980). "The terms of the implied contract are supplied by the bulletins, circulars and regulations made available to the student." Gally, 22 F. Supp. 2d at 206. "Thus, 'if the contract with the school

were to provide for certain specified services, such as for example, a designated number of hours of instruction, and the school failed to meet its obligation, then a contract action with appropriate consequential damages might be viable.'" Clarke v. Trustees of Columbia Univ. of City of New York, 95 Civ. 10627 (PKL), 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996) (quoting Paladino v. Adelphi Univ., 89 A.D.2d 85, 92 (2nd Dept. 1982); see also Ansari v. New York Univ., 96 Civ.. 5280 (MBM), 1997 WL 257473, at *3 (S.D.N.Y. May 16, 1997) (finding that promises of "state-of-the-art facilities, faculty tutor-advisors, appropriate recognition upon completion of the program, overviews of the latest techniques, program activities from 9:00 A.M. to 4:00 P.M. every day, and membership in the [American Association of Orthodontics]" were specific and enforceable).  "In order to state a claim for breach of such a contract, a student must identify 'specifically designated and discrete promises.'" Nungesser v. Columbia Univ., 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (quoting Ward v. New York Univ., 99 Civ. 8733 (RCC), 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000)).

B.     **Analysis**

The Amended Complaint alleges that "Defendant breached its agreement with Plaintiffs and the Class members by misreporting data that were used to calculate its rankings to [U.S. News]" and "by representing to [U.S. News] that it possessed certain characteristics, qualifications, requirements, benefits, and levels of attainment that it did not . . . actually possess."  (Am. Cmplt. (Dkt. No. 32) ¶¶ 284-291)

In seeking dismissal, Columbia argues that "the Complaint fails to plead the most basic element of a breach-of-contract claim – a contractual term that was breached."  (Def. Br. (Dkt. No. 44) at 22)

In opposing dismissal, Plaintiffs argue that

> Defendant provided a "specific promise" to Plaintiffs and putative class members that by enrolling at Columbia, a prospective student is enrolling in a university with a high place ranking atop the [U.S. News] rankings, possessing certain characteristics, qualifications, requirements, benefits, and levels of attainment that it did not . . . actually possess.

(Pltf. Opp. (Dkt. No. 45) at 24)

But this formulation of Plaintiff's breach of contract claim is not consistent with what is pled in the Amended Complaint. As noted above, the Amended Complaint states that "Defendant breached its agreement with Plaintiffs and each Class member by <u>representing to</u> [U.S. News]</u> that it possessed certain characteristics, qualifications, requirements, benefits, and levels of attainment that it did not . . . actually possess." (Am. Cmplt. (Dkt. No. 32) ¶ 291 (emphasis added)) Pleading that Columbia made misrepresentations to U.S. News does not demonstrate that Columbia made a "specifically designated and discrete promise" to Plaintiffs. <u>Nungesser</u>, 169 F. Supp. 3d at 370. "[W]hile a school may be subject to a cause of action for breach of contract, this requires a contract which provides for certain specified services. . . ." <u>Chira v. Columbia Univ. in New York City</u>, 289 F. Supp. 2d 477, 486 (S.D.N.Y. 2003) (internal quotations and citations omitted).

Plaintiffs have not pled the breach of any such contract here. Accordingly, their breach of contract will be dismissed.[8]

---

[8] "Because the Court dismisses the individual claims of each of the named plaintiffs, the Court lacks jurisdiction over the state-law class claims of the unnamed putative class members." <u>Chufen Chen v. Dunkin' Brands, Inc.</u>, 2018 WL 9346682, at *8 (E.D.N.Y. Sept. 17, 2018), <u>aff'd</u>, 954 F.3d 492 (2d Cir. 2020) (collecting cases).

V.     **UNJUST ENRICHMENT**

Columbia argues that Plaintiffs' unjust enrichment claim should be dismissed as duplicative of their other claims.  (Def. Br. (Dkt. No. 44) at 25)  Plaintiffs do not respond to Defendant's argument.  (See Pltf. Opp. (Dkt. No. 45) at 26)

A.     **Applicable Law**

"Under New York law, '[u]njust enrichment is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.'" Barton v. Pret A Manger (USA) Ltd., 535 F. Supp. 3d 225, 248 (S.D.N.Y. 2021) (quoting Parks v. Ainsworth Pet Nutrition, LLC, 377 F. Supp. 3d 241, 248 (S.D.N.Y. 2019)).  "[U]njust enrichment is not a catchall cause of action to be used when others fail."  Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012).  "Courts regularly dismiss unjust enrichment claims brought as an alternative theory when the claims rely on a similar set of facts as the plaintiff's other claims."  Bermudez v. Colgate-Palmolive Co., 667 F. Supp. 3d 24, 46 (S.D.N.Y. 2023). "Two claims are duplicative of one another if they 'arise from the same facts . . . and do not allege distinct damages.'"  NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008) (omission in original) (quoting Sitar v. Sitar, 50 A.D.3d 667 (2d Dept. 2008)).

"[C]ourts in the Second Circuit have consistently held that unjust enrichment claims [that] are duplicative of GBL claims [should be dismissed]."  Barton, 535 F. Supp. 3d at 249 (collecting cases); see also Alce v. Wise Foods, Inc., 17 Civ. 2402 (NRB), 2018 WL 1737750, at *12 (S.D.N.Y. Mar. 27, 2018) (dismissing unjust enrichment claim where allegations were a "mere regurgitation of those made with respect to plaintiffs' . . . claims under the GBL"); Parks, 377 F. Supp. 3d at 248-49 (plaintiff's unjust enrichment claim "duplicates his

[GBL and] other claims based on the same alleged misrepresentation that the [p]roducts are 'natural,' and is therefore dismissed"); Borenkoff v. Buffalo Wild Wings, Inc., 16 Civ. 8532 (KBF), 2018 WL 502680, at *5 (S.D.N.Y. Jan. 19, 2018) (holding that where unjust enrichment allegations are "entirely duplicative of [a plaintiff's] GBL § 349 claim . . . [,] the unjust enrichment claim must be dismissed under New York law"); Grossman v. Simply Nourish Pet Food Co. LLC, 516 F. Supp. 3d 261, 285 (E.D.N.Y. 2021) ("Because plaintiff's unjust enrichment claim under New York law is based on the same allegations as her claims of violations of GBL §§ 349 and 350 . . ., and because plaintiff has not shown how her unjust enrichment claim differs from her other New York claims, the Court dismisses plaintiff's unjust enrichment claim as duplicative of her other New York claims.").

## B.   ANALYSIS

Here, Plaintiffs' unjust enrichment claim is premised on the same factual allegations underlying their GBL claims, and seeks the same damages:

> Plaintiffs and the Class members paid a premium for tuition and other fees to attend Columbia, a [U.S. News] top-ranked educational institution, with class sizes, faculty resources, student-faculty ratios, graduation and retention rates, and financial resources that Columbia represented to be supportive of its [U.S. News] ranking.
>
> . . . .
>
> As a result of the foregoing, Defendant was enriched at the expense of Plaintiffs and the Class members by Defendant's wrongful conduct and actions, and accordingly, it is against equity and good conscience to permit Defendant to retain such enrichment.

(Am. Cmplt. (Dkt. No. 32) ¶¶ 307, 310)

Because Plaintiffs' unjust enrichment claim is duplicative of their other claims, Columbia's motion to dismiss the unjust enrichment claim will be granted.

## VI.    LEAVE TO AMEND

District courts have "broad discretion in determining whether to grant leave to amend." Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000).  Leave to amend may properly be denied in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  "Where the possibility exists that [a] defect can be cured," leave to amend "should normally be granted" at least once. Wright v. Ernst & Young LLP, 1997 WL 563782, at *3 (S.D.N.Y. Sept. 10, 1997), aff'd, 152 F.3d 169 (2d Cir. 1998) (citing Oliver Schs., Inc. v. Foley, 930 F.2d 248, 253 (2d Cir. 1991)).  Moreover, where a claim is dismissed on the grounds that it is "inadequate[ly] [pled]," there is "a strong preference for allowing plaintiffs to amend." In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 2011 WL 4072027, at *2 (S.D.N.Y. Sept. 13, 2011) (citing Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990)).

Here, Plaintiffs have requested leave to amend "[o]n the chance that the Court deems [the Amended Complaint's] allegations are deficient." (Pltf. Opp. (Dkt. No. 45) at 31)

Plaintiffs Student A, Student C, and Student D's lack of standing is "fatal to [their] claims.  These are not deficiencies that can be remedied through supplemental pleading." Le Bouteiller v. Bank of New York Mellon, 14 Civ. 6013 (PGG), 2015 WL 5334269, at *11 (S.D.N.Y. Sept. 11, 2015).  The same is true of Plaintiff Campbell's GBL claims, which are barred by the applicable statute of limitations.

As to Plaintiff Campbell and Plaintiff Student B's breach of contract claim, they had "the benefit of a pre-motion letter from [Columbia] stating the grounds on which it would

move to dismiss." <u>Cruz v. D.F. Stauffer Biscuit Co.</u>, 20 Civ. 2402 (PGG) (JLC), 2022 WL

4592616, at *9 (S.D.N.Y. Sept. 29, 2022).  (Sept. 23, 2022 Pltf. Ltr. (Dkt. No. 16) at 2)  In

Columbia's pre-motion letter, Defendant explained in detail why the breach of contract claim

was defective:

> <u>Breach of Contract</u>:  Plaintiffs allege that they entered into a contract by accepting Defendant's offer to provide an education, and that Defendant breached the contract by reporting inaccurate data to [U.S. News].  A plaintiff asserting such a claim against a university under New York law must identify a specifically designated and discrete promise that was breached.  Plaintiffs fail to identify any promise or representation made to them by Defendant (let alone one related to data reported to a third party publication), which is fatal to their claims. Moreover, to the extent their claims are premised on the quality of the education they received, they are barred by New York's prohibition against claims for educational malpractice.  Finally, Plaintiff's damages claims – which rely on a theory that they paid a "premium" for attending Columbia – are impermissibly speculative.

(<u>Id.</u> at 2)  The grounds listed in Defendant's letter are the same grounds that Columbia asserted

in its motion to dismiss.  (<u>See</u> Def. Br. (Dkt. No. 44) at 21-24)

  While it appears highly unlikely that Campbell and Student B can plead a breach

of contract claim that will survive a motion to dismiss, the Court cannot find that it is impossible.

Accordingly, Campbell and Student B are granted leave to amend their breach of contract claim.

  Leave to amend the unjust enrichment claim is denied.  "Any amendment to the

unjust enrichment claim . . . would be futile as duplicative." <u>Kominis v. Starbucks Corp.</u>, 22

Civ. 6673 (JPC), 2023 WL 6066199, at *11 (S.D.N.Y. Sept. 18, 2023).

## CONCLUSION

  Defendant's motion to dismiss is granted as to all of Plaintiffs' claims, except as

to Plaintiff Student B's claims under General Business Law §§ 349 and 350.  Leave to amend is

granted only as to Campbell and Student B's breach of contract claim.  Any motion for leave to

file a Second Amended Complaint will be submitted by **April 8, 2024**.  Any proposed Second

Amended Complaint will be attached as an exhibit to the motion papers.  The Clerk of Court will terminate the motion (Dkt. No. 43).

Dated: New York, New York
      March 26, 2024

                                      SO ORDERED.

                                        _____
                                        Paul G. Gardephe
                                        United States District Judge